UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
Sarah Husain, *et al.*,

             Plaintiffs,

- against -

Marlene Springer, *et al.*,

             Defendants.
-----------------------------------------------------------X

OPINION & ORDER

97 CV 2982 (NG) (CLP)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 1 5 2013 ★
BROOKLYN OFFICE

GERSHON, United States District Judge:

In 1997, defendant Marlene Springer, the president of the College of Staten Island ("CSI"), part of the City University of New York ("CUNY"), nullified and rescheduled a CSI student government election in reaction to a student newspaper's endorsement of a slate of candidates. After years of litigation culminating in a decision in the Court of Appeals, *Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007), and an unappealed award of nominal damages, *Husain v. Springer*, 691 F.Supp.2d 339 (E.D.N.Y. 2009), plaintiffs now seek attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## BACKGROUND

In their third amended complaint, plaintiffs, who include editors of a CSI student newspaper, some of whom were also candidates in the election, and an unaffiliated student who voted in the election, alleged that defendants violated their First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 for defendants' "imposition of viewpoint-based restrictions on the publication of a student newspaper, thereby depriving the *College Voice* editors and staff of their First Amendment right to be free from such restrictions in the state-created forum" and also sought relief for violations of the New York State Open Meeting Laws. *See Husain v. Springer*, 494 F.3d at 119. The

defendants sued were: President Springer; various CSI employees; various CUNY employees; CUNY and its Board of Trustees; CSI; and CSI's Student Elections Review Committee ("SERC") (collectively, the "CUNY Defendants"). CSI students who served on the student government during the 1996-1997 academic year were also named as defendants (the "Student Government Defendants"). Plaintiffs sought declaratory judgment, injunctive relief, nominal compensatory damages of $1.00 from each of the defendants, and punitive damages of $1.00 from each of the Student Government Defendants and $20,000 from each of the CUNY Defendants.

The plaintiffs moved for a preliminary injunction to prevent the CUNY Defendants from prohibiting plaintiffs from publishing endorsements of candidates in future student government elections at CSI or any other CUNY college and from taking reprisals against plaintiffs, including cancellation of any election results, for publishing such endorsements. Magistrate Judge Pollak heard plaintiffs' application and recommended that I grant the preliminary injunction based, in part, on representations that CSI would continue to cancel student government elections if the *College Voice* newspaper published an edition similar to the May 1997 edition at issue. After Judge Pollak issued her Report and Recommendation, defendants informed me that the rule in question, which provided that "Publications funded by Student Activity Fee (sic) cannot be used as campaign flyers or posters during the student elections and cannot be used as a means to distribute campaign flyers or posters," had been repealed. The plaintiffs' motion for a preliminary injunction was denied.

Later, various defendants were dismissed on a variety of grounds, including Eleventh Amendment Immunity. *Husain v. Springer*, 193 F.Supp.2d 664 (E.D.N.Y. 2002). All state law claims were dismissed. *Id.* And the claims against the Student Government Defendants were dismissed on the ground that they were not state actors. *Id.* I further found that the claims for

declaratory and injunctive relief were moot in light of the defendants' change in position, and the fact that they had repealed the rule. I noted defendants' representations that, in addition to repealing the rule, defendants

> will not change the Rules governing the Spring 2000 Student Elections at the College of Staten Island prior to the resolution of litigation in this case or, in fact, during the duration of President Springer's administration, nor will defendants cancel any election in response to endorsements or opinions on elections published in student newspapers. In sum, defendants have agreed that they will not prohibit any College of Staten Island student activity fee-funded publications from being used as campaign flyers and posters.

*Id.*, at 670. I therefore held that, "by agreeing not to reinstate the challenged rule or engage in the challenged behavior, defendants have met their burden of showing that the alleged violation is unlikely to recur, and plaintiffs have offered nothing to contradict this showing." *Id.*

On motions for summary judgment, I dismissed all remaining defendants except defendant Springer and held that, although she had violated plaintiffs' First Amendment rights, chilling their speech by cancelling the election as a result of the May 1997 edition of the *College Voice*, she was nonetheless entitled to qualified immunity because,

> it was not yet clearly established that nullifying and rescheduling the student government election that was the subject of that coverage was an impermissible retribution for that expression. That is, it was not established with sufficient specificity that cancelling a student government election, as opposed to impounding the newspaper, denying funding, or directly disciplining students, would constitute an actionable form of reprisal against them.

*Husain v. Springer*, 336 F.Supp.2d 207, 216 (E.D.N.Y. 2004).

The Court of Appeals for the Second Circuit agreed that Springer's actions had violated plaintiffs' First Amendment rights. *Husain*, 494 F.3d 108. Specifically, the Circuit majority held that,

> at a minimum, when a public university establishes a student media outlet and requires no initial restrictions on content, it may not censor, retaliate, or otherwise chill that outlet's

speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet. Because CUNY had a policy in which it expressly placed no limits on the contents of student publications . . . it is clear that the *College Voice* was a limited public forum in which there were no restrictions on the subjects that could be addressed.

*Id.*, at 124-25. "Because the College Voice operated as such a forum, CSI and its officials could not, under the First Amendment, take adverse action against the student newspaper, including engaging in conduct designed to chill the speech contained in future editions, on the basis of the views expressed in the publication unless such action served a compelling government interest." *Id.*, at 125. The Circuit also found that President Springer cancelled the May 1997 election because of two types of viewpoint discrimination based upon opinions expressed in the *College Voice*. *Id.*, at 126.

> First, Springer's action was driven by her belief that only one perspective was acceptable for speech on student elections in a student newspaper . . . [s]econd, Springer's testimony reveals that her nullification of the initial election was premised on her belief that the *College Voice's* view as to the importance of electing the Student Union slate . . . was improper and should be excluded from the limited public forum of the student newspaper.

*Id.* The Second Circuit, citing *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995), concluded that "as the Supreme Court and this court have repeatedly emphasized, once a state institution opens a limited forum to speech on a particular topic, it may not act against a speaker in that forum on the basis of views they express on that topic." *Husain*, 494 F.3d at 127.

The Circuit further found that plaintiffs were harmed by Springer's violation of their First Amendment rights. "Defendants assert that any harm the plaintiffs may have suffered as a result of the nullification of the election does not rise to the level of cognizable constitutional injury. This argument is entirely without merit." *Id.*, at 128. Because Springer, a state university official, retaliated against the *College Voice* "for publishing certain content in an effort to force the

newspaper to refrain from publishing that or similar content in the future," her actions created a chilling effect which gave rise to "a First Amendment injury." *Id.* (internal citations omitted).

Regarding the issue of relief available to the plaintiffs moving forward, the Court of Appeals noted that, in the course of oral argument before it, "counsel for plaintiffs conceded that the only relief sought ... is nominal damages." *Id.*, at 135 n. 17. The Circuit determined that plaintiffs had waived their appeal of my rulings that injunctive and declaratory relief were moot. *Id.*, at 121 n.10.

However, the Circuit found that granting President Springer qualified immunity, as I had done, was premature as issues of fact remained as to whether she relied on certain election rules when she decided to nullify the election and, if she did in fact rely on the election rules, whether her reliance was reasonable. The Second Circuit thus vacated the judgment in Springer's favor and remanded the case to this court for further proceedings with respect to defendant Springer, the sole remaining defendant in the case. *Husain*, 494 F.3d at 134.

Plaintiffs' petition for certiorari to the Supreme Court, challenging the dismissal of the Student Government Defendants and the denial of summary judgment to plaintiffs, was denied. *Husain v. Springer*, 552 U.S. 1258 (2008).

After remand, defendant Springer moved for entry of judgment against herself in the amount of nine dollars (one dollar for each remaining plaintiff) without a concession of liability on her part; plaintiffs opposed the motion. I granted defendant's motion, holding that, "Where a defendant has consented to judgment for all the relief the plaintiff can win at trial (according to the trial court's determination), the defendant's refusal to admit fault does not justify a trial to settle questions which can have no effect on the judgment." *Husain*, 691 F.Supp.2d at 341, *quoting ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 93 (2d Cir.2007), *cert. denied*, 522

U.S. 1295 (2008). Judgment was entered in plaintiffs' favor on October 27, 2009. Plaintiffs did not appeal.

For the reasons set forth below, plaintiffs' motion for attorney fees and costs is granted to the extent indicated.

## DISCUSSION

Plaintiffs' counsel seeks $832,409.67 in fees and costs, which he arrived at by multiplying the number of hours he and his staff spent working on this matter, from May 21, 1997 through January 25, 2011, by an hourly rate for each worker, and then adding costs.

Defendant Springer objects to counsel's fee request on several grounds. Defendant asserts that plaintiffs' recovery of nominal damages precludes them from receiving a fee award, but argues that, if the court grants a fee award, the fee award requested by plaintiffs' counsel is excessive and should be severely reduced because of plaintiffs' lack of success and the excessiveness of counsel's billing. Defendant argues that the requested fees for paralegal work should also be denied or, in the alternative, should be reduced because they are excessive and not all recoverable and that reimbursement of costs should be denied or substantially reduced for excessiveness as well.

### I. Prevailing Parties and Entitlement to Attorney's Fees

42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1970, allows a prevailing party in some civil rights actions, including cases brought pursuant to 42 U.S.C. § 1983, to recover "a reasonable attorney's fee." There is a two step inquiry made by the court to determine whether to award such fees. First, the party seeking the award must be a "prevailing party;" if it is, the court then determines whether the fee requested is reasonable. *See Pino v. Locascio*, 101 F.3d 235, 237 (2d Cir. 1996) (*citing Farrar v. Hobby*, 506 U.S. 103 (1992), and *Hensley v. Eckerhart*, 461 U.S. 424

(1983)). A plaintiff prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Lefemine v. Wideman*, — U.S. —, 133 S.Ct. 9, 11 (2012) (quoting *Farrar*, 506 U.S. at 111-112).

Although "a technical victory may be so insignificant . . . as to be insufficient to support prevailing party status," *Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 792 (1988), here, the Circuit determined not only that plaintiffs' First Amendment rights were violated, but also that plaintiffs were injured by the violation. On remand, a judgment for nominal damages was entered. A party recovering only nominal damages is a prevailing party under § 1988, and the magnitude of the relief obtained does not affect a party's status as a prevailing party. *Farrar*, 506 U.S. at 105. Since the Court of Appeals held that defendant Springer violated plaintiffs' First Amendment rights, and this court entered a judgment awarding plaintiffs nominal damages, plaintiffs are prevailing parties.

Defendant, citing *Farrar*, 506 U.S. at 114, argues that plaintiffs won only a "formal" or "technical" victory and should not receive attorneys' fees. The plaintiffs in *Farrar* sought $17 million in damages. The Supreme Court determined it was a "technical" victory because, although a jury determined that plaintiffs' civil rights were violated, plaintiffs did not prove damages, as the jury found that the deprivation of rights was not the proximate cause of plaintiffs' damages. Here, in contrast, as explained above, the Second Circuit found that President Springer's actions violated plaintiffs' First Amendment rights and that her actions injured plaintiffs by chilling their speech. *Husain*, 494 F.3d at 128. Their victory was not a mere technical or formal one.

Although the judgment in this case does not recite that the defendant is liable, an admission of liability by the defendant is not required for the award of attorneys' fees. As stated in *Buckhannon Bd. and Care Home, Inc., v. West Virginia Dept. of Health and Human Resources*,

> In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. . . . Although a consent decree does not always include an admission of liability by the defendant, [*see, e.g., Maher v. Gagne*, 448 U.S. 122, at 126 n. 8 (1980)], it nonetheless is a court-ordered chang[e] [in] the legal relationship between [the plaintiff] and the defendant.

532 U.S. 598, 604 (2001) (internal quotation marks and citations omitted). Here, their award of nominal damages did amount to a court ordered change in the legal relationship between the plaintiffs and defendant Springer. Moreover, as I said in granting defendant's motion to award nominal damages against herself without an admission of liability, and over plaintiffs' objection, the precedential effects of the Circuit's ruling as to the First Amendment right of the student newspaper editors would continue whether the defendant admitted liability or not. *Husain*, 691 F.Supp.2d at 343.

The Supreme Court has "made clear that plaintiffs may receive fees under § 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 131 S.Ct. 2205, 2214 (2011). "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar*, 506 U.S. at 114, *quoting Hensley*, 461 U.S. at 436. *See also Kassim v. City of Schenectady*, 415 F.3d 246 (2d Cir. 2005). Plaintiffs here vindicated their First Amendment rights and received a favorable ruling that they were injured because defendant's actions resulted in the chilling of their speech. And, although not a factor to be

taken into account for determining whether plaintiffs are prevailing parties, *Buckhannon*, 532 U.S. 598, after plaintiffs filed this suit and Judge Pollak recommended the grant of a preliminary injunction, defendants repealed the rule in question and promised not to "reinstate the challenged rule or engage in the challenged behavior" during President Springer's tenure. *Husain* 193 F.Supp.2d at 670.

Defendant argues that no fees should be awarded because this case was not important, as the law was established. Defendant's argument on this point contradicts the position she took throughout this litigation. If the law was, as the defendant contends, so established, then there was no need for defendant to so vigorously contest plaintiffs' claims. Although Chief Judge Jacobs disagreed about the importance of the issues in his dissent, the panel majority wrote a lengthy opinion explaining the history of this case and the scope of First Amendment rights of student editors at public universities. It engaged in a comprehensive analysis of applicable First Amendment law and a lengthy discussion of why President Springer's actions violated the First Amendment, addressing, and rejecting, in detail, defendant's arguments for why she had not. In sum, an award of fees is appropriate.

## II. Reasonableness of Fees

"Determining a 'reasonable attorney's fee' is a matter that is committed to the sound discretion of a trial judge." *Perdue v. Kenny A.*, 130 S.Ct. 1662, 1676 (2010). The Second Circuit has "repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." *Kassim*, 415 F.3d at 252. Rather, "[a] court should compensate the plaintiff for the time his attorney reasonably spent in achieving the

favorable outcome, even if 'the plaintiff failed to prevail on every contention.'" *Fox*, 131 S.Ct. at 2214, *quoting Hensley*, 461 U.S. at 435. The "presumptively reasonable fee" for an attorney's work is what a reasonable client would be willing to pay for that work. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections*, 522 F.3d 182, 190 (2d Cir.2008). The trial court needs to determine whether the hours "were reasonably expended and thus billable." *Rivera ex rel. DeJesus v. Commissioner of Social Sec.*, No. 05 CV 4465, 2009 WL 1924772 (E.D.N.Y. Jun. 2, 2009), *quoting Bunn v. Bowen*, 637 F.Supp. 464, 469-70 (E.D.N.C. 1986). "The fee award, of course, should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work 'cannot be deemed to have been expended in pursuit of the ultimate result achieved.'" *Id.* But the presence of unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights. *Fox*, 131 S.Ct. at 2214.

**A. Attorney Rates and Hours**

As noted above, "[t]he reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190. In determining the appropriate hourly rate, the district court should, among other things, "attempt to approximate the market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Green v. City of New York*, 403 Fed.Appx. 626, 629 (2d Cir. 2010) (*citing Arbor Hill*, 522 F.3d at 190 and *quoting Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)). "[I]n order to provide adequate compensation where the services were performed many years before the award is made, the rates used by the court . . . should be 'current rather than historic hourly rates.'" *Gierlinger*, 160 F.3d at 882 (quoting *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989)). Current rates, rather than historic rates,

are used in an effort to "compensate [the attorney] for the delay in payment" of fees. *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998). "The court is not necessarily required, however, to award attorneys' fees based on current hourly rates when the delay is due in whole or in substantial part to the fault of the party seeking fees." *Gierlinger*, 160 F.3d at 882. In other words, a court can apply a historic rate, "requiring counsel to bear the cost of the delay caused by him or by his client." *Id.*

In this case, I will use the reasonable hourly rate for 2010 because, even allowing for reasonable adjournment requests from both sides, plaintiffs' counsel, in requesting more than six adjournments, delayed the submission of his fee motion papers beyond a reasonable date. Plaintiffs' counsel's papers were initially due 30 days after October 27, 2009. Plaintiffs' counsel sent his motion papers to the defendant on August 20, 2010. Defendant's opposition was then due on September 20, 2010, but defense counsel sought two adjournments. The motion papers were ultimately filed on January 25, 2011.

Plaintiffs' counsel seeks to be reimbursed for 1949.1 hours: 504 hours at a rate of $350 per hour for his work from May 21, 1997 through May 31, 2000 and 1445.1 hours at a rate of $400 per hour from June 1, 2000 through January 25, 2011. Mr. McGuire states that he worked 744.4 hours from May 21, 1997 through May 31, 2000 and 1445.1 hours at a rate of $400 per hour from June 1, 2000 through January 25, 2011. Mr. McGuire states that he worked 744.4 hours from May 21, 1997 through May 31, 2000, but subtracted 24.4 hours for the time he spent on a sanctions motion, leaving 720 hours. He then reduced that number by 30 % because he estimated that 30 % of his hours had been spent on unsuccessful claims against the Student Government Defendants, seeking

reimbursement for a total of 504 hours during that period. He also states that he worked 1403 hours from June 1, 2000 through March 17, 2008, from which he subtracted 52 hours for the time he spent working on a sanctions motion, leaving 1351 hours. He then further reduced that number by 30% based upon his estimation of time spent on unsuccessful claims against the Student Government Defendants, for a total of 956.7 hours during that period. From March 18, 2008 through January 25, 2011, Mr. McGuire worked 315.1 hours which he reduced by 30% because he was ill for an extended period of time (from October 29, 2009 through August 19, 2010), for a total of 220.5 hours, plus an additional 278.9 hours, for a total of 499.4 hours. I am starting my calculations with 1949.1 hours, the total number of hours for which Mr. McGuire seeks compensation for his legal work after subtracting all of his reductions.

Mr. McGuire was admitted to practice in 1987, and had been practicing law for ten years at the inception of this case, and by now, in 2013, he has been practicing law for 26 years. He undertook this case without a fee, committed substantial resources to its litigation, and risked time and effort with no ultimate guarantee that he would be compensated for those efforts.

Reasonable hourly rates in the Eastern District of New York in 2010 ranged from $300 to $400 per hour.[1] *See, e.g., Luca v. County of Nassau*, 698 F.Supp.2d 296, 301-02 (E.D.N.Y. 2010). While Mr. McGuire has considerable experience as a litigator, his background is not as extensive as those "highly experienced and impeccably credentialed" partners who "have been awarded rates

---

[1] Plaintiffs' counsel argues that in the event that Eastern District rates do not support his fee request, he should be considered a Southern District attorney because the Southern District compensates attorneys at a higher rate. Mr. McGuire, however, is not a Southern District attorney. Although he has a private mail box located in the Southern District, he states in his declaration in support of his fee motion that he practices law out of his home office in New Jersey. He has not met his burden for receiving Southern District, or any out-of-district rate. *See Simms v. New York City Transit Authority*, 575 F.3d 170 (2d Cir. 2009). Therefore, Eastern District rates will apply.

on the higher end of the attorneys' fees spectrum." *Ueno v. Napolitanto*, No. 04 CV 1873, 2007 WL 1395517, at *9 (E.D.N.Y. May 11, 2007) (awarding rates of $450, $400, and $350 for attorneys who have practiced civil rights law for 42, 21, and 29 years respectively and collecting cases). Based on all the circumstances, including the time span, I will apply a rate of $320 for all of Mr. McGuire's hours. Travel time, however, will be compensated at a rate of $160, one half the amount of the hourly rate. *See, e.g. Hugee v. Kimso Apartments, LLC*, 852 F.Supp.2d 281, 302 (E.D.N.Y. 2012), citing *Perdue*, 130 S.Ct. at 1670 (approving the district court's decision to "halve [] the hourly rate for travel hours") and *Barfield v. N.Y. Health & Hospitals Corp.*, 537 F.3d 132, 139, 151 (2d Cir. 2008)("travel time by counsel should be compensated at half-rate, in accordance with established court custom").

In sum, while *Arbor Hill* held that strict compliance with the "forum rule" is not required, 522 F.3d at 191-194, in this case, I am satisfied the rate just determined is what a reasonable client would be willing to pay for Mr. McGuire's services.

**B. Degree of Success**

"The Supreme Court has consistently stressed the importance of the degree of the plaintiff's success in the litigation as a factor affecting the size of the fee to be awarded." *Kassim*, 415 F.3d at 253. The Second Circuit has adopted the view that,

> a district judge's authority to reduce the fee awarded to a prevailing plaintiff below the [presumptively reasonable fee] by reason of the plaintiffs 'partial or limited success' is not restricted either to cases of multiple discrete theories or to cases in which the plaintiff won only a nominal or technical victory.

*Kassim*, 415 F.3d at 256. The assessment of the degree of success is not limited to whether a

plaintiff prevailed on individual claims. *Id.*, at 254. "Both the quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved." *Barfield*, 537 F.3d at 152 (internal citations and quotation marks omitted). Plaintiffs' main objective in filing this case was to obtain injunctive and declaratory relief from the court, requiring defendants to repeal the rule in question. They also sought nominal and punitive damages from various defendants. Although plaintiffs received a favorable determination from the Second Circuit and an entry of judgment against defendant Springer for nominal damages, I note that plaintiffs did not receive any of the injunctive, declaratory or punitive relief they sought. Rather, the rule in question was repealed voluntarily by the defendants, and the request for injunctive relief was thereafter denied as moot.

In analyzing the individual claims, although most of the claims in this case were unitary, in that they involved a common nucleus of facts and related legal theories, plaintiffs' claim against the Student Government Defendants, as acknowledged by plaintiffs' counsel, was separable. Since the plaintiffs did not succeed on the separable claim against the Student Government Defendants, plaintiffs' counsel, on his own, reduced blocks of time expended on this case, as specified above, by 30 %.

Counsel's explanation of why he chose to reduce his hours by 30% for this separable claim is problematic. Counsel did not go through his billing records and eliminate the hours he spent on this claim from the total number of hours for which he requests compensation. Rather, counsel divided the time expended on the entire case by him and his staff into 37 segments. He then analyzed the word counts of "argumentative documents" he filed with the court in each of the segments to determine the percentage of words in each document associated with claims other than

-14-

the separable claim against the Student Government Defendants. He then averaged the calculated percentages and determined that, prior to dismissal from the case, the Student Government Defendants' claim accounted for 27.1 % of the words he submitted to the court in "argumentative documents." Thus, counsel decreased the hours requested prior to the denial of certiorari by 30 %. Counsel's calculation did not take into account the amount of time he spent researching the separable claim.

Plaintiffs thought the issue of the Student Government Defendants' liability was sufficiently important that they raised it, unsuccessfully, to the Supreme Court on a petition for certiorari. Indeed, review of the petition shows that the principal goal of the petition was to revive the claim against the Student Government Defendants. Keeping the Student Government Defendants in the case, however, would not have furthered plaintiffs' main objective in this action, as the Student Government Defendants were not alleged to have had any control over implementation of any rule at CSI, let alone the rule in question. Counsel has not calculated, and indeed his records do not allow for a calculation of, the amount of legal hours he spent on this claim. His estimate of 30%, based upon a word count, is arbitrary. In sum, I cannot accept the reduction of 30%, while it is considerable, as sufficiently accounting for plaintiffs' lack of success on this claim.

At the conclusion of the instant litigation, what plaintiffs had obtained was defendant's voluntary repeal of the challenged rule during the pendency of defendant Springer's tenure and a judgment of nominal damages, without an admission of liability, against only one defendant out of the 24 defendants initially sued. They also secured a comprehensive statement of students' First Amendment rights, as described above, from the Second Circuit, albeit over a strong dissent. Taking all of the circumstances into account, I find it is appropriate to reduce the requested attorney's fees

by 35% to reflect the limitations to the success plaintiffs achieved. After the reduction, 1266.9 billable hours of attorney work time and 26.5 hours of travel time remain.[2]

### C. Reasonableness of Hours Expended

Turning to the reasonableness of the hours expended on this case, I conclude that plaintiffs' counsel spent an excessive amount of time. And, though counsel reduced his total number of hours in part because he recognized he was inefficient during a period he was ill, I find it necessary to further reduce counsel's hours to account for his excessiveness. Experienced attorneys should be able to spend less time on work than less experienced attorneys. Yet, counsel, whom I am compensating at a rate reserved only for partners, spent an inordinate amount of time on this case, which belies his experience. His motion papers were lengthy and not always on point. *See, e.g. Husain*, 691 F.Supp.2d at 342 ("Plaintiffs spend considerable space defending the position that a claim for nominal damages, where available, is ordinarily sufficient to support standing in federal court. . . . But defendant does not argue that plaintiffs lacked standing to pursue their suit once the Second Circuit had determined that only their claim for nominal damages remained, only that it would be inappropriate to permit them to do so after she has offered to pay the full amount demanded under that claim."). At oral argument, plaintiffs' counsel had to be redirected to the relevant facts and issues. He worked on a motion for *en banc* review of the Second Circuit's 2007 decision which he never filed, and yet he seeks fees, albeit reduced, for the hours he expended on

---

[2] Mr. McGuire billed for 16.9 hours of travel time from May 21, 1997 through May 31, 2000, less 1.6 hours erroneously billed on May 27, 1997. He then reduced that by 30% for time spent on unrelated claims for a total of 10.7 hours. He also reduced his hours of travel for the period from June 1, 2000 through March 17, 2008 by 30%, from 33.9 hours to 23.7 hours for time spent on unrelated claims. He billed for 6.3 hours of travel time for the period of March 18, 2008 through January 25, 2011. My calculations started from 40.7 hours, the total number of travel hours after all of counsel's reductions.

the motion. He constantly sought adjournments of due dates. After he filed motion papers or sometimes letters to the court, he would review and re-review them and move to submit errata papers correcting citations, spelling and other errors he would find. *See, e.g., Husain v. Springer*, 97-CV-2982, Doc. 493, Ex. 10 at 36, 38 (charging hours for reviewing, correcting and refiling motion papers previously served on opposing counsel and filed with the court). He seeks reimbursement for 318.3 hours[3] on his fee motion alone, which, in my experience, is grossly unreasonable. *See, e.g., E.S. v. Katonah-Lewisboro School Dist.*, 796 F.Supp.2d 421, 431 (S.D.N.Y. 2011) ("[A] court should reduce the award where the requested fee is excessive because the stated number of hours is greater than that which should have been required for the work produced."). In my experience, a motion for attorney's fees, even in a lengthy case such as this, should not have taken 318 hours to prepare.

Upon review of counsel's billing records, many of the entries are block-billed, a practice by which counsel recorded the total number of hours spent on this matter each day, without separating the time spent on separate tasks. *E.S.*, 796 F.Supp.2d at 432. Though not forbidden, block-billing makes it "difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided." *Simmonds v. N.Y.C. Dep't of Corrections*, No. 06-CV-5298, 2008 WL 4303474, at *8 (S.D.N.Y. Sept. 16, 2008). Where billing records include a large number of block-billed entries, and there is an issue as to the reasonableness of the number of hours counsel spent on the matter, as there is here, an across the board reduction in billing hours is appropriate. *See, e.g., Green*, 403 Fed.Appx. at 630.

In addition, many of the billing entries are vague and contain only generalized descriptions,

---

[3] Mr. McGuire's records reflect that he spent 412.9 hours on his fee motion. He reduced the hours to 318.3 because he had health problems for a period of that time and did not work efficiently.

such as "review cases" and "research" or "phone calls", without explanation of what counsel was reviewing or researching or who he was calling and why he was making the call. Entries such as these do not allow the court to determine the reasonableness of the hours spent on those tasks. *Vishipco Line v. Charles Schwab & Co.*, 2003 WL 1936142, at * 2 (S.D.N.Y. Apr. 23, 2003) (time entries such as "legal research" too vague to allow court to determine reasonableness of time expended); *Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 301 (S.D.N.Y.2001) (time entries such as "legal research," which do not indicate the subject matter of the work performed, "do not permit a thorough evaluation").

A court can use its discretion to make across the board percentage reductions to the amount of billed hours where the court determines that the hours are excessive and unreasonable. *Luciano v. Olsten Corp.*, 109 F.3d 111, 117 (2d Cir. 1997). Where, as is the case here, "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the law, to assess the reasonableness of the hours spent." *Yea Kim v. 167 Nail Plaza, Inc.*, No. 05 CV 8560, 2009 WL 77876 (S.D.N.Y. Jan. 12, 2009). Therefore, I will further reduce counsel's billable and travel hours by 50% for excessiveness to 633.5 hours of attorney work time and 13.3 hours of attorney travel time. Counsel is awarded $204,848.00 in fees.

### D. Paralegal Rates and Hours

In 2010 in the Eastern District of New York, hourly rates for paralegals ranged from $70 to $100. *See, e.g, Brady v. Wal-Mart Stores, Inc.*, No. 03-CV-3843, 2010 WL 4392566 at *5 (E.D.N.Y. Oct. 29, 2010) (collecting cases). In this instance, I will set a rate of paralegal compensation

commensurate with legal education, experience, and the circumstances of this case: for Mr. McGuire, $95 per hour; for Mark Yu, $85 per hour; and for Raymond Chen, Michael Lesnick, Neil Schiuldiner and Zachary Arcidiacono, $75 per hour.

I will consider the following time spent by paralegals: 49.3 hours by Mark Yu, 66.4 hours by Raymond Chen, 4 hours by Michael Lesnick, 7.1 hours by Neil Schiuldiner and 6.6 hours by Zachary Arcidiacono. I do not consider time which the paralegals spent on clerical or secretarial services, which are part of overhead and generally not charged to clients. *Guardado v. Precision Fin., Inc.*, No. 04–CV–3309, 2008 WL 822105, at *6 (E.D.N.Y. Mar. 25, 2008). Also, time spent by an attorney on administrative, secretarial or ministerial tasks is not compensable. *Hugee*, 852 F.Supp.2d at 302. Mr. McGuire spent an inordinate amount of the time for which he requests compensation for paralegal work billed by an attorney on tasks that are not compensable, such as copying, faxing, mailing and filing. In addition, his paralegal time is almost always recorded in a block-billed entry, so I cannot properly determine how much of his time was spent on compensable tasks. Therefore, I will reduce his paralegal time by 50%, to 267.6 hours.[4] Further reducing all the paralegal hours 35% for partial degree of success and 50% for excessiveness, results in 16 compensable hours for Mr. Yu, 87 for Mr. McGuire and 27.4 hours for the other paralegals for a total of $11,680.00.

### III. Costs

Defendant reiterates the same arguments for denial of costs that she made for denial of

---

[4] Mr. McGuire billed 772.7 hours of his time as paralegal time for this action. He discounted 19.5 hours from the 455.7 hours he billed from May 21, 1997 through March 17, 2008. He then halved the remaining 436.2 hours from that billing period, arriving a total of 218.1 hours for that time frame. Adding the 218.1 hours to the 317 hours he worked from March 18, 2008 through January 25, 2011, the total number of paralegal hours he seeks reimbursement for is 535.1, which is the number I halve in the calculation above.

attorney's fees. As explained above, plaintiffs are entitled to attorney's fees and, for those same reasons, plaintiffs are entitled to costs as well. I disallow $880.73 in noncompensable costs. I will reduce the $8,292.55 in LEXIS charges by 35% for partial degree of success and 50% for excessiveness. This leaves $2,695.08 in compensable LEXIS charges and $14,016.12 in compensable costs, for a total of $16,711.20.

## CONCLUSION

For the reasons stated above, plaintiffs are awarded $204,848.00 in attorney's fees, $11,680.00 in paralegal compensation and $16,711.20 in costs, for a total of $233,239.20.

SO ORDERED.

s/Nina Gershon

NINA GERSHON
United States District Judge

Dated: Brooklyn, New York
March 14, 2013